NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0318n.06

No. 25-2154

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>JOSEPH CHRISTOPHE ISAAC ROBITAILLE,</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>Plaintiff-Appellant,</td><td>)<br>)</td><td rowspan="2">ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN</td></tr>
<tr><td>v.</td><td>)<br>)<br>)</td></tr>
<tr><td>TRINITY HEALTH GRAND RAPIDS,</td><td>)<br>)</td><td></td></tr>
<tr><td>Defendant-Appellee.</td><td>)<br>)<br>)</td><td>OPINION</td></tr>
</table>

FILED
Jul 20, 2026
KELLY L. STEPHENS, Clerk

Before: KETHLEDGE, NALBANDIAN, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. Trinity Health Grand Rapids Hospital suspended Doctor Joseph Christophe Isaac Robitaille's clinical privileges and conditioned their reinstatement on a fitness-for-duty evaluation. Rather than submit to that evaluation, Robitaille sued. He alleged that Trinity's evaluation condition—and his continued suspension for refusing it—violated state and federal law. The district court granted summary judgment to Trinity. We affirm.

I

Robitaille joined Trinity in 2022 under a three-year contract. In late 2023, after an unplanned disruption of Trinity's computer systems, Robitaille began pressing management to adopt additional safety protocols for system outages. Tensions flared when Robitaille again raised concerns about Trinity's system-disruption preparedness during a December staff meeting. According to attendees, Robitaille diverted the meeting's topic, interrupted several colleagues, and

appeared agitated and frustrated. Trinity's Chief Medical Officer, Doctor Brandon Francis, asked Robitaille to "step outside," but Robitaille refused. Robitaille Decl., R.79-1, PageID 1925.

After the meeting, Francis referred the matter to Trinity's human-resources department. That department investigated Robitaille's conduct and determined that it did not align with hospital standards. Around the same time, Trinity's peer-review body, the Practitioner Excellence Committee (Practitioner Committee), got involved. The Practitioner Committee is made up of hospital staff. It is responsible for investigating physicians' disruptive or unprofessional behavior and for routinely reviewing treatment decisions to improve Trinity's operations. After conducting its own investigation of Robitaille's recent conduct, the Practitioner Committee similarly concluded that his professionalism fell short of hospital expectations.

Over the months that followed, Trinity's staff reported still further concerns with both Robitaille's clinical performance and his interpersonal conduct. Coworkers observed that he appeared increasingly hesitant to handle complex cases, refused to treat patients on several occasions, struggled to manage his assigned rooms, and became increasingly guarded and uncommunicative. One clinical supervisor reported that Robitaille was not providing the same standard of care as other anesthesiologists and that several staff members were uncomfortable working with him. Colleagues also described him as increasingly paranoid, citing instances where he claimed that he was being watched or that Trinity's administration was out to get him. To avoid accusations of mishandling controlled substances, Robitaille would hold up medications to operating room cameras. And he showed hesitancy to dispose of excess controlled substances with other medical personnel.

Doctor Ashley Screws, the head of anesthesiology, communicated many of these concerns to Francis. She stated that "Dr. Robitaille's paranoia [was] affecting his ability to see patients and

function as a member of [the] team" and that his behavior was "becoming quite burdensome" to the department by forcing others to absorb his workload. Screws Email 2/5/24, R.72-26, PageID 1564.

As these concerns escalated, several of Robitaille's clinical choices also came under scrutiny by the Practitioner Committee. That committee sent Robitaille letters requesting explanations for certain patient-care choices, including multiple instances in which he refused to provide care. Robitaille responded to the first two requests with a brief email that referred the Practitioner Committee to the patient's file and accused it of making "assumptions regarding [his] intentions." Robitaille Email 2/6/24, R.72-20, PageID 1537. The record contains no response to the next batch of requests.

Based on this pattern of conduct, and after an unsuccessful meeting with Robitaille, Screws summarily suspended Robitaille's clinical privileges in February 2024. On March 6, 2024, the Medical Executive Committee (Executive Committee)—Trinity's "clinical governing body," Screws Dep., R.72-5, PageID 1218, comprising various members of the medical staff, including senior management, department chairs, and elected members—reviewed the suspension. Before the review, Screws sent the Executive Committee members a summary of the concerns with Robitaille's clinical performance and his behavioral conflicts. After considering Screws's report, the Executive Committee voted to uphold Robitaille's suspension based on his "disruptive behavior adversely affecting the effective operation of the Hospital." Executive Committee Meeting Minutes 3/6/24, R.72-29, PageID 1574. The Executive Committee conditioned any reconsideration of the suspension on Robitaille completing a fitness-for-duty examination that included both drug testing and a forensic psychiatric evaluation.

Robitaille took the drug test, which returned negative. But he refused the psychiatric evaluation and thus remained suspended. In August 2024, when his current privileges were already set to expire, Robitaille submitted a reappointment application. The Executive Committee denied reappointment and explained that it could not adequately assess Robitaille's ability to provide satisfactory patient care without the psychiatric evaluation. Robitaille appealed the Executive Committee's decision through Trinity's internal-review process. His three-year employment contract expired in August 2025, and Trinity elected not to renew it.

While the internal-review process was pending, Robitaille obtained a right-to-sue letter from the Equal Employment Opportunity Commission and initiated this suit, asserting claims under the Americans with Disabilities Act (ADA) and state law. The district court granted Trinity summary judgment on Robitaille's ADA claims and declined supplemental jurisdiction over his state-law claim. Robitaille timely appealed.

## II

We review the district court's grant of summary judgment de novo. *Kroll v. White Lake Ambulance Auth.*, 763 F.3d 619, 623 (6th Cir. 2014). We accept all the non-movant's evidence as true and draw all reasonable inferences in the non-movant's favor. *Id.* But we need not accept "bare" or "conclusory" allegations. *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005) (citation omitted). Rather, non-movants must "substantiate their theories" by "point[ing] to record-based evidence." *Cahoo v. SAS Inst., Inc.*, 71 F.4th 401, 406 (6th Cir. 2023).

## A

Robitaille claims that Trinity violated the ADA in two ways. First, he claims that the fitness-for-duty examination was a prohibited medical inquiry under the ADA. Second, he

contends that Trinity unlawfully retaliated against him when he refused the psychiatric test. We reject both arguments.

1

We start with Robitaille's challenge to the fitness-for-duty examination.

Under the ADA, a covered employer may not "require a medical examination" of an employee unless it is both "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The employer must show that the decision-maker who ordered the examination formed "a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Kroll*, 763 F.3d at 623. If so, the employer can "requir[e] mental and physical exams as a precondition to" continued employment. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999).

The statutory standard authorizing medical examinations can be met by performance- or safety-based issues. On the performance side, an examination is proper if an employer has "a reasonable basis" to believe that the employee is "unable to perform the essential functions of [his] job." *Kroll*, 763 F.3d at 624. Thus, when an employee's "aberrant behavior" affects his "job performance," an employer may be justified in "ordering a mental examination." *Sullivan*, 197 F.3d at 812. On the safety side, requests are proper if the employer has a "reasonable basis" to believe that the employee "pose[s] a direct threat to [his] own safety or the safety of others." *Kroll*, 763 F.3d at 624. Safety-based concerns carry particular weight in high-stress environments—like hospitals—where "employees are in positions where they can do tremendous harm if they act irrationally." *Id.* at 626 (citation modified). In such settings, employers "may be justified in requesting a psychological exam on slighter evidence than in other types of workplaces." *Id.*

The fitness-for-duty examination ordered by the Executive Committee included both a drug test and a psychiatric evaluation. Though a test for illegal drug use "shall not be considered a medical examination" for ADA purposes, 42 U.S.C. § 12114(d)(1), Trinity has not disputed that the drug test it ordered triggers ADA protections. Because Trinity has not raised the issue, we assume without deciding that the drug test went beyond illegal substances and could be categorized as a medical examination. *See Bates v. Dura Auto. Sys., Inc.*, 767 F.3d 566, 574 (6th Cir. 2014). For the reasons below, we conclude that the Executive Committee had a reasonable basis, grounded in objective evidence, to require both the drug-test and psychiatric component of the examination.

At its March 6 meeting, the Executive Committee reviewed Screws's summary report on Robitaille's performance issues and peculiar behavior. That report contained recaps of Screws's own experiences with and opinions of Robitaille's performance as his department head. And it included concerns from numerous other staff members. Robitaille does not contest that the Executive Committee based its decision on Screws's report. Nor does he offer any reason why the Executive Committee should have doubted the report's contents.

The clinical shortcomings Screws presented—Robitaille's hesitation to perform routine tasks, avoidance of higher-risk patients, and inability to handle the standard caseload—could all cause a reasonable person to question whether Robitaille was "still capable of performing his job." *Sullivan*, 197 F.3d at 811. Likewise, Robitaille's reported "aberrant behavior"—including paranoid ideation and excessive risk-aversion—noticeably impaired his job performance by causing inefficiencies and delays. *Id.* at 812. Because Robitaille practiced anesthesiology, these performance concerns were inextricably linked with patient safety. Administering life-threatening anesthetic agents is inherently high-stakes work where a single careless or "irrational[]" decision

by Robitaille could "do tremendous harm" to patients in his care. *Kroll*, 763 F.3d at 626 (citation modified).

The combination of documented performance shortfalls and behavioral red flags thus gave the Executive Committee reasonable grounds to question both whether Robitaille was "still capable of performing his job," *Sullivan*, 197 F.3d at 811, and whether he "posed a direct threat" to patient safety, *Kroll*, 763 F.3d at 624. Given the nature of these concerns, the Executive Committee reasonably sought to rule out underlying impairments related to substance abuse or mental health that could be hindering Robitaille's fitness to practice. The decision to require the medical examination was therefore both "job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

Robitaille's counterarguments fail. At the outset, Robitaille contends that the district court misapplied the summary judgment standard by accepting as true some of Screws's allegations in her report to the Executive Committee. But the district court did not rely on "the underlying truth" of those allegations. Dist. Ct. Op., R.89, PageID 2757. Rather, it correctly identified that "the relevant question is whether the [Executive Committee] had a 'reasonable belief' that a medical exam was warranted." *Id.* (quoting *Kroll*, 763 F.3d at 623). And it explained that "the underlying truth of Screws'[s] claim does not impact whether the [Executive Committee] was reasonable in relying on it." *Id.* So the district court did not improperly assume the truth of Screws's report.

Next, Robitaille argues that the district court erred by relying on a peer-review transcript from Trinity's internal appeals process, which took place in January 2025. Robitaille's objection is that Michigan law restricts the use of such records in litigation. *See* Mich. Comp. Laws § 333.20175(13). That argument also fails. Robitaille does not contest that the statute he cites forms part of Michigan's peer-review privilege regime, *see Krusac v. Covenant Med. Ctr., Inc.*,

7

865 N.W.2d 908, 911 (Mich. 2015), and he agrees that privilege does not apply in this case, *see* Fed. R. Evid. 501; *Univ. of Pennsylvania v. E.E.O.C.*, 493 U.S. 182, 189 (1990). And indeed, in an earlier round of motions practice, Robitaille successfully persuaded the district court that "Michigan's state law regarding the use and maintenance of patient records and the protection of peer review documents" did not apply to this case. Resp. in Opp'n to Defs.' Mot. to File Docs. Under Seal, R.20, PageID 440. He then reversed course when opposing Trinity's motion for summary judgment, seeking to bar consideration of the internal-appeals-process documents. But Robitaille fails to show that the district court's rejection of his about-face constitutes an abuse of discretion. *See Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012); *cf. Allied Erecting & Dismantling Co. v. United States Steel Corp.*, 2023 WL 5322213, at *10 (6th Cir. Aug. 18, 2023).

Robitaille's remaining contentions reframe the case to focus on the actions of one man: Chief Medical Officer Francis. Robitaille asserts that circuit precedent requires a single decision-maker in ADA medical-examination claims and that the district court thus erred in focusing on the collective decision of the Executive Committee rather than Francis alone. According to Robitaille, Francis ordered the fitness-for-duty examination as part of a crusade of retaliation kickstarted by Robitaille's patient advocacy during the December 2023 staff meeting. From here, Robitaille asserts that all subsequent performance and safety concerns were pretext for Francis's vendetta. Robitaille then invokes agency principles to seek to hold Trinity liable for Francis's actions.

Robitaille's arguments stumble at each turn. To start, as Trinity points out, this focus on Francis makes its first appearance on appeal. Before the district court, Robitaille never claimed that Francis unilaterally drove the fitness-for-duty examination requirement. "As a general rule in this Circuit, arguments raised for the first time on appeal are forfeited." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 781 (6th Cir. 2015). We see no reason to deviate here.

Aside from forfeiture, Robitaille faces several hurdles. His claim that medical-examination decisions must be attributable to a single individual—not a collective body—imports a new requirement into our caselaw. It's true that past decisions have explained that "the *individual* who decides to require a medical examination must have a reasonable belief based on objective evidence that the employee's behavior threatens a vital function of the business." *Kroll*, 763 F.3d at 623 (emphasis added). But that statement simply describes what it takes to form a "reasonable belief." *Id.* It does not restrict the medical-examination decision to a single individual. *See Painter v. Ill. Dep't of Transp.*, 715 F. App'x 538, 543 (7th Cir. 2017) (order) (*Kroll* "cannot be read as defining a rule of law that a single decision-maker must be readily identifiable"). To the contrary, our caselaw recognizes that the ultimate choice may be made by a collective body. *E.g.*, *Sullivan*, 197 F.3d at 809.

Nor are we convinced by Robitaille's attempt to inject a pretext analysis into his ADA medical-examination claim. For starters, our decision in *Sullivan* adopted the objective-evidence standard for ADA medical-examination claims and held that "there is no need to assess an employer's intent in ordering a fitness-for-duty examination." 197 F.3d at 813. Robitaille counters that "more recent cases from this circuit show that a pretext analysis is allowed in medical examination cases" and points us to *Babb v Maryville Anesthesiologists PC*, 942 F.3d 308 (6th Cir. 2019). Robitaille Br. 54. *Babb*, though, evaluated whether an employer's *termination* decision was pretextual. 942 F.3d at 322-24. The plaintiff did not bring an ADA medical-examination claim. So the opinion does not alter *Sullivan*'s approach to medical examinations.

Regardless, Robitaille could not prevail even if pretext were relevant. He maintains that the medical-examination request was motivated solely by his patient advocacy in the December staff meeting. But he fails to address the Executive Committee's reliance on months' worth of

9

subsequent performance and behavior issues as well as Robitaille's failure to cooperate with the Practitioner Committee. Those issues, as mentioned, provided an intervening, non-retaliatory basis for the Executive Committee to order the medical examination. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012).

Robitaille counters that the record is disputed as to whether these performance issues in fact occurred and the nature of his explanation for the cited instances. Robitaille insists that he "responded to all of [the requests], explaining the reasons for his actions" and claims that those "responses were ignored." Robitaille Br. 50. But he admitted in a peer-review hearing that he never responded. His brief does not address this inconsistency, and none of the documents he cites suggests that he responded to the Practitioner Committee's requests. It is Robitaille's obligation to provide the record support for his factual assertions. Fed. R. App. P. 28(a); *cf. Cahoo*, 71 F.4th at 406. Because he failed to do so, we do not accept his unsupported assertions as true for purposes of assessing pretext.

Finally, Robitaille gestures towards a shifting-rationales argument for showing pretext. On this front, he claims that "the most compelling evidence supporting [his] ADA medical examination claim" is that Trinity listed "disruptive behavior" as the rationale for his suspension, not "paranoia." Robitaille Br. 40 (citation modified). In Robitaille's view, disruptive behavior would not "necessitate intervention by a psychiatrist" whereas paranoia would. *Id.* So he sees Trinity's current focus on paranoia as a post-hoc justification for the psychiatric exam. But we reject Robitaille's premise that there's any "shift[]" in these concepts. *Id.* at 43. Rather, paranoid behavior can be disruptive, as the record in this case bears out: Multiple staff members and the Executive Committee itself characterized Robitaille's odd behavior as "disruptive," Executive Committee Meeting Minutes 3/6/24, R.72-29, PageID 1574, "burdensome," Screws Email 2/5/24,

R.72-26, PageID 1564, causing "issues/delays," Forzley Email 1/31/24, R.72-23, PageID 1549, and resulting in "in-efficiency [sic] and delays" in hospital operations, Screws Summary, R.72-18, PageID 1534.

For the foregoing reasons, we affirm the district court's grant of summary judgment to Trinity on Robitaille's medical-evaluation claim. Because this ground alone warrants affirmance, we do not address Trinity's other arguments in favor of summary judgment.

2

We next address Robitaille's ADA-retaliation claim.

The ADA prohibits discrimination "against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a). To establish retaliation, Robitaille must demonstrate "(1) that he engaged in protected activity; (2) that he suffered adverse employment action; and (3) that a causal connection existed between the protected activity and the adverse action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). Robitaille's retaliation claim fails at the first element.

All along, Robitaille has treated his retaliation claim as coterminous with his medical-examination claim. He asserts that he had "a reasonable belief that Trinity acted unlawfully" for the same reasons his medical-examination claim should survive. Robitaille Br. 59. So he argues that refusing to take the psychiatric examination was per se protected activity. But, as discussed, Trinity's request did not violate the ADA, and Robitaille offers no other arguments that his opposition was reasonable and grounded in good faith. *Cf. Sullivan*, 197 F.3d at 814. Robitaille's argument that he engaged in protected activity therefore fails.

We affirm the district court's grant of summary judgment to Trinity on the retaliation claim.

B

Finally, Robitaille appeals the dismissal of his state-law wrongful discharge claim. He does not argue that the district court abused its discretion in declining supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010). He asks only that we reinstate the state-law claim if we reverse the district court's grant of summary judgment on either of his federal-law claims. Because we affirm the district court on both, we also affirm its decision to decline supplemental jurisdiction.

\* \* \*

We affirm the judgment of the district court.